UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MINDY WESSINGER,

                              Plaintiff,

                                                    5:14-CV-00175
v.                                                  (MAD/TWD)

OSI RESTAURANT PARTNER'S LLC,

                              Defendant.

_____

APPEARANCES:

MINDY WESSINGER
Plaintiff *pro se*
4279 Altair Course
Liverpool, New York 13090


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        The Clerk has sent this *pro se* Complaint together with an application to proceed *in forma pauperis* to the Court for review.  (Dkt. Nos. 1and 2.)  Plaintiff Mindy Wessinger has commenced this action for discrimination in employment on the grounds of age and religion and for sexual harassment, hostile work environment, and retaliation against Defendant OSI Restaurant Partner's LLC, pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634(b), as amended, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*.  For the reasons that follow, the Court: (1)  grants Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2); (2) recommends that Plaintiff's

claims under the ADEA, her claims under Title VII for sexual harassment, and her Title VII claims for retaliation and termination based upon religious discrimination, be dismissed *sua sponte* without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and (3) further recommends that Defendant be required to respond to Plaintiff's Title VII hostile work environment claim based upon her claim of religious discrimination.

## I.      PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

A court may grant *in forma pauperis* status if a party "is unable to pay " the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's *in forma pauperis* application, I find that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is granted.

## II.     ALLEGATIONS OF THE COMPLAINT

Plaintiff, who resides in Liverpool, New York, applied for a job at Outback Steak House ("Outback") in early August of 2011. (Dkt. No. 1 at ¶¶ 1, 3.) Plaintiff was fifty-one years old at the time, and at the end of her interview, Tanya Rothenburg ("Rothenburg"), who appears to have had some type of supervisory position at Outback, told Plaintiff "[w]e don't usually hire people your age because they tend to get flustered." *Id.* at ¶ 1.

Plaintiff was nonetheless hired, and almost from the beginning of her employment at Outback, fellow employee, Melissa Port ("Port"), who worked four or five days a week with Plaintiff, began harassing her. *Id.* at ¶ 3. Because Plaintiff is a member of the Mormon faith, she did not have a knowledge of alcohol, and Outback had not yet offered her the training class on alcohol. *Id.* Port was mean and rude to Plaintiff because she had to ask a lot of questions. *Id.*

Port would ignore Plaintiff and make her stand and wait for drinks. *Id*. She also made drinks come out late to Plaintiff's tables. *Id*. Plaintiff was required to fill out goal cards before the start of a shift, and when Plaintiff would ask Port, as the key person, to initial her card, Port would walk right by her. *Id.*

Port was so mean that Plaintiff told her manager, Brad Woodard ("Woodard"), and Rothenburg that Port should be fired because of the way she treated people. *Id*. at ¶, 3. Woodard laughed. *Id*. Plaintiff knew Port would not be written up because she and Woodard were very close. *Id.*

Rothenburg often yelled at Plaintiff. *Id*. at ¶ 4. When Plaintiff called back for mashed potatoes to be started, she was yelled and screamed at by Rothenburg, who took her aside in a booth and talked to her. *Id*. Rothenburg told Plaintiff she was the only one allowed to do it, but Plaintiff observed that when other servers did it, Rothenburg had no problem. *Id*.

In February of 2012, Outback employees were required to take an online EEOC test. *Id*. at ¶ 5. Plaintiff informed Woodard that she was computer illiterate but would have her son-in-law log her onto the site so she could take the test. *Id*. Plaintiff took the test and talked about having taken it at work that night. *Id*. She then left for Utah for two weeks because her daughter had a baby. *Id*. While in Utah, Plaintiff was told that Woodard wanted to speak with her. *Id*. He told Plaintiff she had to take the test. *Id*. Plaintiff responded, "I took it before I left and missed a steak question," and noted that Woodard had then shown employees the difference in two steaks. *Id*. Woodard responded, "I don't have time to make sure all my servers take the test." Plaintiff kiddingly responded, "I'm on vacation and don't have time to take it." However, then she said she would take the test when her daughter came home and logged her in. *Id*.

After Plaintiff's daughter had tried to log her in thirteen times, Plaintiff finally called an 800 number and spoke to a woman who told her she had to be reinstated and needed to call Woodard. *Id*. Plaintiff called Woodard, who said he needed proof she had tried to log on. *Id*. She called Woodard back close to midnight and was told he had left for the night, and she would have to call back the following day. *Id*. Plaintiff was flying home so she decided to wait to speak with Woodard when she got home. *Id*. Plaintiff went into work and was told she was no longer employed because she didn't take the mandatory test. *Id*.

Plaintiff contacted the area director, who told her there was nothing she could do about it. *Id*. Plaintiff learned through her son, who also worked at Outback, that Rothenburg had taken the test for all of the cooks, dishwashers, K-Prep, and anyone else who hadn't taken it, except for Plaintiff. *Id*. Another Outback employee told Plaintiff that Woodard had disconnected her so she couldn't take the test after they spoke on the phone while she was in Utah. *Id*. Plaintiff called the Outback corporate offices in Tampa, Florida to speak with the President of the Company. *Id.*

Plaintiff was called back by an Outback Vice-President, told him everything that had happened, and got her job back. *Id*. During the conversation, Plaintiff was asked if she had a problem with Woodard. *Id*. She responded that she did not – that she had made him chicken and biscuits the day before she left for Utah, and he had given her another back rub.[1] *Id*. Woodard lost his job but told Plaintiff it was not because of her. *Id*.

Before Woodard left, Rothenburg went on a screaming fit and tried to get Plaintiff to quit.

_____

[1] Plaintiff has alleged that Woodard gave her a shoulder and back rub in September of 2011. (Dkt. No. 1 at ¶ 2.)

*Id.* Plaintiff told her that she was tired of being treated differently from other employees and was going to call Corporate. *Id.* Rothenburg pushed Plaintiff aside, grabbed all of her receipts, and told her to leave. *Id.* Plaintiff was written up but allowed to come back a week later if she signed the write up, which she signed even though it was not true because she needed her job. *Id*.

While Plaintiff worked at Outback, employees made religious remarks about Mormons and made fun of Mitt Romney to try to get her going. *Id*. at ¶ 6. Use of the "Fu__" word got worse, and music with the F word kept being played with management doing nothing. *Id*. Plaintiff was asked it Mormons have oral sex. *Id.*

Port and Robyn Lewis ("Lewis") hated Plaintiff and in their eyes she could never do or say anything right. However, when they needed a closer, Plaintiff was asked to close, and when certain customers came in, Lewis assigned them to Plaintiff because they seemed to like her, and she was able to deal with them. *Id.* at ¶ 7. Plaintiff won every contest in suggestive selling – even alcohol – and she led in sales of food and alcohol. *Id*. at ¶ 8. She helped every server who asked. *Id.* If dishes were piling up, Plaintiff would wash them without being asked. She even washed windows. *Id*. A fellow employee always asked Plaintiff why she stayed when they treated her like "sh___." *Id*. at ¶ 9. Plaintiff explained that she had applied for work at forty-seven places before Old Navy and Outback hired her, and that she had to support herself. *Id*.

When Plaintiff applied at Outback, she asked for Sundays and Tuesdays off. *Id*. She taught Sunday school but sometimes went in late to cover for someone at Outback. *Id.* New manager, Patrick Kenny ("Kenny"), scheduled a mandatory meeting on a Sunday morning in early February 2013. *Id.* at ¶ at 10. Plaintiff asked if she could miss the meeting because she

taught Sunday school, and Kenny told her everyone had to be at the meeting, although he allowed three male employees not to attend for different reasons. *Id.*

The following Sunday, Plaintiff covered a shift for a fellow employee who had received tickets to a basketball game at Syracuse University for Christmas. *Id.* at ¶ 11. A huge fight broke out in the kitchen. A server had called a dish washer "gangster" and told other employees he had been in jail for being a gang member. *Id.* A salad maker ally of the dish washer also became involved in the fight. *Id.* The dish washer began throwing dish racks and swearing. *Id.* The customers at one of Plaintiff's tables heard the fight, and Plaintiff excused herself and went into the kitchen to stop it. *Id.* Lewis, a manager, was right next to the dish washer during the fight and did nothing. *Id.* The people at Plaintiff's table, who left her a $35.00 tip, contacted Corporate the next day and complained that it was the worst dining experience they ever had, and Corporate wanted everyone involved fired. *Id.* Plaintiff was suspended for a week. *Id.* Plaintiff told Kenny if she lost her job for breaking up a fight, she would fight it. *Id.*

The mandatory Sunday meeting Plaintiff attended was about a $10.00 off two entrees coupon. *Id.* at ¶ 12. People were bringing the coupon in on their phones and Outback required paper copies. Outback gave customers its email address so they could email the coupon and have it printed in the Outback office. *Id.* On one occasion, Plaintiff needed management approval for customers' use of the two entrees coupon. *Id.* She asked Kenny, who told her she would have to go to Port who had his keys and his card. *Id.* Port was sitting at a table speaking with someone so Plaintiff waited five minutes for her to finish. Port continued to talk, so Plaintiff went back to Kenny for assistance three times. He yelled that he could not do anything. *Id.* Plaintiff went back to Port, and when Port paused in her conversation, Plaintiff asked her to go to the office and

get a coupon since she had Kenny's keys and card. *Id.* Port looked at Plaintiff with disgust and told her she was at a table. *Id.* Plaintiff told Port that her table had been waiting for fifteen minutes. *Id.* Port told Plaintiff she had to leave "right now." *Id.* After being told by Kenny that Port would get the receipt, and then checking out her customers, Plaintiff was informed that because Port said she had to leave, she had to leave. *Id.* Plaintiff spoke to Kenny about it, and he said that Port had told him Plaintiff rudely interrupted her while she was at a table. *Id.* Port then confirmed that Plaintiff had to leave. *Id.*

The following day, Kenny and Steve Torrino met Plaintiff in the office. *Id.* During the conversation, Kenny said "I admire your religion. I never had a problem with you. But with the last few things you've been involved with, we can't keep you here." *Id.* The next day, Plaintiff called Corporate and told the Vice-President with whom she had previously spoken about employees coming in late; swearing; an employee who constantly talked about sex and sex acts; the smoking of vapor cigarettes and blowing the vapor in employees' faces; and servers and bartenders giving their friends free food and drinks. *Id.* at ¶ 13. Plaintiff told him that when employees complained, management did nothing about it. *Id.* Plaintiff told the Vice-President what had happened with Port, and she explained to him that she had always given her best to Outback. *Id.* The Vice-President never got back to Plaintiff. *Id.*

The U.S. Equal Employment Opportunity Commission ("EEOC") mailed Plaintiff a right to sue letter on November 20, 2013.[2] (Dkt. No. 1 at p. 15.) Plaintiff received the notice on

_____

[2] Plaintiff's Dismissal and Notice of Rights from the EEOC indicates that the EEOC adopted the findings of the state or local fair employment practices agency that investigated her claim, presumably the New York State Human Rights Division. (Dkt. No. 1 at p. 15.) The Court has no information before it with regard to the specific nature and scope of Plaintiff's

November 23, 2013, and filed her Complaint on February 21, 2014. *Id.* at pp. 14-15.

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (*per curiam*) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

administrative complaint against Defendant.

state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## IV.  ANALYSIS

### A.  Discrimination on the Basis of Age

To state a claim of discrimination under the ADEA, a plaintiff must plead facts plausibly suggesting that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  To state a claim for retaliation under the ADEA, Plaintiff must plead facts plausibly suggesting that "(1) she participated in a protected activity [known to the employer], (2) that she suffered an adverse employment action; and (3) there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); see also *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006) ; *Kelly v. Howard I. Shapiro & Assoc. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2010).  To state a hostile work environment claim under the ADEA, a plaintiff must plead facts tending to show that the conduct complained of: "(1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and creates such an environment because of the plaintiff's [age]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation and internal quotation marks omitted).

The sole allegation in Plaintiff's Complaint regarding her age is that during her interview,

Rothenburg told her that they didn't usually hire people her age because they tended to get flustered. (Dkt. No. 1 at ¶ 1.) Plaintiff has failed to include any factual allegations or information as to how age played a factor in any of the actions of which she complains, *i.e.*, her mean, unfair, and disparate treatment by management and other employees at the restaurant, suspensions, and the termination of her employment. Nor are there any factual allegations in the Complaint suggesting that Plaintiff complained to local management or Corporate about age related discrimination, or that she engaged in any type of protected activity that resulted in retaliation against her based on age. Therefore, the Court finds that Plaintiff has failed to state a claim against Defendant under the ADEA.

### B. Sexual Harassment

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions or privileges of employment, because of the individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment under Title VII includes actions based on a hostile environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive – both subjectively and objectively – to alter the conditions of the victim's employment and create an abusive working environment."[3] *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citations and internal quotation marks omitted).

---

[3] Actions which constitute sexual harassment under Title VII include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a) (1985)).

Isolated instances will generally not suffice to establish a hostile work environment, although a single episode may be sufficient if severe enough. *Redd*, 678 F.3d at 175-76.

Plaintiff has alleged that local Outback restaurant manager Woodard gave her a shoulder and back rub shortly after she began her employment at Outback and had given her a back rub the day before she left for vacation in Utah. (Dkt. No. 1 at ¶¶ 2, 5.) Plaintiff used the second back rub as an illustration that she and Woodard got along when asked by Defendant's Vice-President.[4] *Id*. at ¶ 5. Plaintiff's Complaint is devoid of allegations plausibly suggesting any kind of sexual harassment severe or pervasive enough to alter the conditions of her employment and create an abusive working environment. Nor does the Complaint include allegations that Plaintiff complained to Defendant or facts showing a nexus between the back and shoulder rub and the allegedly discriminatory actions of which she complains that would support a retaliation claim. Therefore, the Court finds that Plaintiff has failed to state a claim for sexual harassment under Title VII.

### C. Discrimination on the Basis of Religion

Plaintiff has alleged that because she is a member of the Mormon faith, she had no knowledge of alcohol. (Dkt. No. 1 at ¶ 3.) She claims that Port was mean and rude to her because she had to ask her a lot of questions about it. *Id*. Plaintiff has also alleged that while she worked at Outback, employees made religious remarks about Mormons, made fun of Mitt Romney to upset her, and increasingly used the "Fu__" word and played music with the "Fu__"

---

[4] Plaintiff has alleged in her Complaint that Woodard was terminated by Defendant shortly after her conversation with the Vice-President but does not allege a connection between the conversation and termination or retaliation against her as a result of his termination. (Dkt. No. 1 at ¶ 5.)

word, with management doing nothing. *Id*. Plaintiff was asked if Mormons have oral sex. *Id*. In addition, the restaurant manager scheduled a mandatory meeting for a Sunday morning and would not excuse Plaintiff from the meeting so she could teach her Sunday school class, although he let three men miss the meeting for other reasons. *Id*. at ¶ 10.

1.    Failure to Accommodate

As noted above, Title VII prohibits discrimination in employment on the basis of religion. *See Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006). Title VII provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or perspective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. §2000e(j). In order to make out a *prima facie* case of discrimination based on an employer's failure to reasonably accommodate, a plaintiff is required to show that "(1) she held a bona fide religious belief conflicting with an employment requirement; (2) she informed her employer of this belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546 (citation and internal quotation marks omitted).

Plaintiff's allegations regarding the mandatory meeting on Sunday morning are inadequate to state a claim because Plaintiff has failed to allege that she was disciplined for failure to comply with the directive that she attend the meeting. The Complaint is devoid of allegations suggesting that she was disciplined for asking to be excused, and it can be inferred from the Complaint that Plaintiff attended the meeting. Moreover, there are no facts in the Complaint from which the Court can infer that Plaintiff's request to miss the meeting for

13

religious reasons had anything to do with the termination of her employment by Defendant, or any other adverse actions. In addition, the Sunday morning meeting appears to have been a one time thing. Therefore, the Court finds that Plaintiff's Complaint fails to state a claim for religious discrimination on failure to accommodate grounds.

### 2. Hostile Work Environment

A plaintiff may establish a discrimination claim under Title VII based upon religion by showing that harassment on the basis of religion created a hostile work environment. *Finegold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004). In order to maintain a hostile work environment claim under Title VII, a plaintiff is required to show, *inter alia*, that: "(1) the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,' *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quotation marks omitted); and (2) the harassment 'occurred because of' [her] membership in a protected class, *id*. at 374." *McDonald v. U.S. Postal Service Agency*, 547 F. App'x 23, 26 (2d Cir. 2013). Among the factors considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Harris*, 510 U.S. at 23. Generally, the incidents must be "sufficiently continuous and concerted in order to be deemed pervasive." *Feingold*, 366 F.3d at 150 (quoting *Alfano*, 294 F.3d at 374); *see also Harris*, 510 U.S. at 21 (to establish the existence of a hostile workplace environment, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.").

Plaintiff's relatively general allegations regarding employees making religious remarks about Mormons and playing offensive music would almost certainly not be sufficient to establish a *prima facie* hostile work place claim and, by themselves, may not even be sufficient to survive a properly made motion to dismiss her hostile work environment claim under Federal Rule of Civil Procedure 12(b)(6).  *See Payton v. City Univ. of New York*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) ("Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim. . . . Nor can offhand comments, isolated incidents, stray remarks, or [plaintiff's] subjective belief constitute a viable claim.") (citations and internal quotation marks omitted).

However, Plaintiff's Complaint is filled with allegations of mean spirited, unfair, and disparate treatment of her by management and other Outback employees, particularly Woodard, Rothenburg, and Port.  The allegations may merely reflect non-actionable dislike or personal animosity, or a lack of workplace respect and civility, and may turn out to have nothing to do with Plaintiff's religion.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (human rights laws are not a civility code for the workplace, but rather seek to address forms of discrimination); *Luongo v. St. Paul Travelers*, No. 07 CV 11282 (LAP), 2009 WL 2432374, at *5, 2009 U.S. Dist. LEXIS 69371, at *15 (S.D.N.Y. Aug. 7, 2009) ("It is well-settled that the anti-discrimination laws are not intended to serve as a general civility code and that personal animosity is simply not prohibited by these laws."); *Brown v. Society for Seaman's Children*, 194 F. Supp. 2d 182, 192 (E.D.N.Y. 2002) ("Plaintiff's complaints, in turn, that [the supervisor] was rude, threatening and combative toward her evidences the hostility between them, but does not provide ground for inferring that the hostility stemmed from plaintiff's [religion]").

15

Nonetheless, for purposes of this initial review, given that the *pro se* Plaintiff has made allegations of improper treatment specifically related to her religious affiliation, it is reasonable for the Court to infer that at least some of the other mean spirited, unfair, and disparate treatment alleged in the Complaint may have been motivated by discriminatory animus towards the Plaintiff based upon her religion.[5] *See Sealed Plaintiff*, 537 F.3d at 191 (*pro se* pleadings must be construed liberally and construed to raise the strongest arguments they suggest). Moreover, it can be reasonably inferred from the Complaint that some of the Outback employees involved in the conduct complained of by Plaintiff held supervisory positions, rendering Defendant presumptively liable under the principles of vicarious liability applied in imputing the existence of a hostile work environment to an employer. *See Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 91-92 (2d Cir. 2002) (courts are to apply agency principles in imputing the existence of a hostile work environment to an employer).

Given the foregoing, the Court recommends that Defendant be required to respond to Plaintiff's Title VII hostile work environment claim based upon religious discrimination.

### 3. Termination of Plaintiff's Employment

In order to establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination." *Ruiz v.*

---

[5] The Second Circuit has noted that "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

*Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). At the pleading stage, Plaintiff is "not

require[d] [ ] to plead facts sufficient to establish a *prima facie* disparate treatment claim."

*Boykin v. KeyCorp.*, 521 F.3d 202, 212 (2d Cir. 2008) (citing *Swierkiewicz v. Sorema, N.A.*, 534

U.S. 506, 511-12 (2002)). Plaintiff need only plead enough facts to state a claim that is

"plausible on its face," *Twombly*, 550 U.S. at 570, and contains factual content "that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.

The allegations in Plaintiff's complaint do not plausibly suggest that Plaintiff's

termination "took place under circumstances giving rise to an inference of [religious]

discrimination." *Ruiz*, 609 F.3d at 491-92. Plaintiff has alleged that when he terminated her

employment, Kenny specifically told her that he had admired her religion and had no problem

with her but could not keep her on because of the last few things she had been involved in. (Dkt.

No. 1 at ¶ 12.) Given the absence of factual allegations suggesting that Plaintiff's termination

resulted from religious discrimination, the Court recommends that Plaintiff's Title VII claim for

termination based upon religious discrimination be dismissed.

### 4. Retaliation

Under Title VII, it is unlawful to retaliate against an employee "because [s]he has

opposed any practice made an unlawful employment practice by this subchapter, or because [s]he

has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To state a claim for

retaliation under Title VII, a plaintiff must plead facts demonstrating: "(1) participation in a

protected activity; (2) that the defendant knew of the protected activity; (3) an adverse

employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011).

Plaintiff has not alleged facts showing that she participated in a protected activity under Title VII. *See, e.g., Byra-Grzegorczyk v. Bristol-Myers*, 572 F. Supp. 2d 233, 249 (D. Conn. 2008) (reporting alleged discrimination by supervisor to employer constituted protected activity). Plaintiff's Complaint includes allegations of complaints made to Defendant at the corporate level during her employment with Outback. (Dkt. No. 1 at ¶¶ 5, 12.) However, the Complaint does not contain facts showing that Plaintiff complained to Defendant employer about religious discrimination, or that her complaints to Corporate were related to her termination. Therefore, the Court recommends that Plaintiff's Title VII claim for retaliation on religious discrimination grounds be dismissed.

## IV.     CONCLUSION

Based upon the foregoing, the Court recommends that Plaintiff's claims under the ADEA and her Title VII claims related to alleged sexual harassment be dismissed. The Court also recommends that Plaintiff's claims for failure to accommodate, termination, and retaliation under Title VII based upon religious discrimination be dismissed. Because the Complaint gives some indication that valid claims might be stated, *Gomez,* 171 F.3d at 795, the Court recommends that the dismissal of those claims be without prejudice, and that Plaintiff be granted leave to serve an amended complaint.

The Court further recommends that Plaintiff's Title VII hostile work environment claim based upon religious discrimination survive initial review, and that Defendant be required to

respond.

**ACCORDINGLY**, it is hereby

**ORDERED**, that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is granted; and it is

**RECOMMENDED**, that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE** and with leave to amend, **EXCEPT** for Plaintiff's hostile work environment claim based upon her claim of religious discrimination under Title VII, and that with regard to that claim, Defendant be required to respond; and it is further

**RECOMMENDED**, that if the District Court approves this Report-Recommendation, the District Court order the Clerk to return the Complaint to this Court for further order setting forth a period of time within which Plaintiff may submit an amended complaint for further review; and in the event Plaintiff elects not to serve an amended complaint, for issuance of an order by this Court directing issuance of a summons and service of the Complaint, and addressing other matters relating to the conduct of the litigation; and it is

**ORDERED,** that the Clerk provide Plaintiff with a copy of the unpublished decision in *Luongo v. St. Paul Travelers*, No. 07 CV 11282 (LAP), 2009 WL 243237 (S.D.N.Y. Aug. 7, 2009), in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report.  Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984

F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15

(2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: May 8, 2014
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge



Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Michele J. LUONGO, Plaintiff,
v.
ST. PAUL TRAVELERS (formerly known as the St.
Paul Travelers Companies, Inc., now known as the
Travelers Companies, Inc.), Defendant.

No. 07 CV 11282(LAP).
Aug. 7, 2009.

West KeySummary**Civil Rights 78** 1203

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
           78k1203 k. Particular Cases. Most Cited Cases

An alleged inquiry into an employee's age by a non-decision-making colleague at the employee's employer-sponsored 47th birthday party was not an adverse employment action under the Age Discrimination in Employment Act (ADEA). The employee testified that she did not have a problem saying her age and, more importantly, that no actions were taken against her thereafter based on her age. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

ORDER
LORETTA A. PRESKA, District Judge.

*1 Plaintiff Michele J. **Luongo**, who voluntarily resigned her position with Defendant St. Paul **Travelers** ("**Travelers**") to take a higher paying position with a competitor, has asserted discrimination claims

based on her age and race and a hostile work environment claim under the ADEA and Title VII. Defendant has moved for summary judgment, and for the reasons set out below, that motion is GRANTED.

I. *BACKGROUND*

A. *Plaintiff's Employment with Travelers*

On February 28, 2005, Plaintiff was hired by Gulf Insurance—a subsidiary of Travelers—as a Reinsurance Claims Analyst. (Affidavit of Joel E. Cohen Esq., sworn to December 19, 2008 ("Cohen Aff."), Ex. 1, Deposition of Michele J. Luongo, taken July 25, 2008 ("Pl.Dep.") at 4–5.) Plaintiff interviewed with Lawrence Lutzack ("Mr.Lutzak"), the then-head of the Ceded Reinsurance Claims Department. (*Id.* at 10–13.) Significantly, Plaintiff was 45 years old at the time she was hired. (*Id.* at 4–5.)

As a Reinsurance Claims Analyst, Plaintiff was responsible for providing claims services to reinsurance brokers. (*Id.* at 5.) In this regard, Plaintiff's responsibilities generally included: (i) reviewing and closing files; (ii) reviewing invoices; (iii) acknowledging requests for information; and (iv) reconciling account balances. (*Id.* at 5–6.) Initially upon her hire, Plaintiff reported directly to Mr. Lutzak. (*Id.* at 13.) However, in or around June 2005, Mr. Lutzak left Travelers, and Cheryl Goodwine–Pittman ("Ms.Goodwine–Pittman") took over as head of the Ceded Reinsurance Claims Department. (*Id.* at 14–15.) Several months later, Plaintiff began reporting directly to Roger Woody ("Mr.Woody"), who in turn reported to Ms. Goodwine Pittman.[FN1] (*Id.*) Mr. Woody and Ms. Goodwine–Pittman are both African–American. (*Id.* at 44.)

    FN1. Plaintiff testified that Mr. Woody was

Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

an "okay" manager and that she did not have any issues with him. (Pl.Dep.19–20.)

### B. *Plaintiff's Unexcused Absences*

Throughout her employment, Plaintiff was counseled on numerous occasions about issues relating to her tardiness, attendance and work product. (*Id.* at 16–18, 23–27, 41–44, Ex. 1.) On August 18, 2006, Plaintiff received a verbal warning from Ms. Good-wine–Pittman concerning her unscheduled absences from the workplace. (*Id.* at 42–43, Ex. 1.) On September 13, 2006, after another unscheduled absence, Plaintiff received a formal written warning on this subject. (*Id.* at 41–43, 46, Ex. 1.) Specifically, the written warning documented that Plaintiff had 13 occurrences of unscheduled absences between January 2006 and September 2006. (Cohen Aff. Ex. 2.) The written warning was issued by Vice President Nick Licato ("Mr.Licato"), who is Caucasian and, according to Plaintiff, believed to be in his 40s or 50s. (Pl. Dep. at 44–45.) Plaintiff did not contest the contents of the written warning. (*Id.* at 45–46.)

### C. *Plaintiff's Team Birthday Party*

In April 2006, Plaintiff's work team held a party at the office to celebrate her birthday. (*Id.* at 28.) Such parties were held for each employee on his or her birthday in an effort to promote team bonding. (*Id.*) Plaintiff testified that the typical team birthday party lasted approximately 5 minutes and consisted of gathering in a conference room, eating cake, giving the employee a card and wishing him or her a happy birthday. (*Id.*) At Plaintiff's birthday party, a non-decision-making colleague asked Plaintiff her age. (*Id.* at 28–29.) Plaintiff, who was turning 47, testified that she did not have a problem saying her age. (*Id* . at 31.) During her employment, Plaintiff never complained to Human Resources about being asked her age at the team party celebrating her birthday. (Affidavit of Diane Kurtzman, sworn to December 8, 2008 ("Kurtzman Aff.") ¶ 4.)

### D. *The NAIW Luncheon*

**\*2** On May 5, 2006, Plaintiff attended a National Association of Insurance Women ("NAIW") luncheon. (Pl. Dep. 31–33; Kurtzman Aff. ¶ 5.) Although the luncheon concluded mid-afternoon—before the end of the regular workday—Plaintiff went straight home and did not return to work. (*Id.*) As a result of her failure to return to work after attending the NAIW luncheon, Plaintiff was required to use a half day (4 hours) from her paid time off ("PTO") bank. (Pl. Dep. 38; Kurtzman Aff. ¶ 5.) Despite being required to use a half day of PTO, Plaintiff received her full salary for that day. (Kurtzman Aff. ¶ 5.) Plaintiff's African–American colleague, Wynsome Bramwell ("Ms.Bramwell"), also attended the NAIW luncheon. (Pl.Dep.33–34.) Unlike Plaintiff, after the NAIW luncheon, Ms. Bramwell returned to the office and worked the remainder of the day. (Kurtzman Aff. ¶ 5.) Because she returned to work after the luncheon, Ms. Bramwell was not required to use any PTO for May 5, 2006. (*Id.*)

### E. *Plaintiff's Voluntary Resignation*

In or around January or February 2006, while she was still employed by Travelers, Plaintiff began looking for another job by posting her resume on various job search web sites. (Pl. Dep. at 8.) In August 2006, Plaintiff interviewed for a higher paying position with rival insurance company AIG. (*Id.* at 7–8.) On September 22, 2006, after approximately 19 months of employment, Plaintiff voluntarily resigned from Defendant. (*Id.* at 6.) Plaintiff accepted the higher paying position and began working at AIG shortly after resigning from Travelers. (*Id.* at 7, 9.) At the time of her resignation, Plaintiff had exceeded her yearly accrued PTO by more than 40 hours. (Kurtzman Aff. ¶ 6.) Travelers did not seek recoupment of the excess PTO from Plaintiff. (*Id.*)

### II. *DISCUSSION*

### A. *Plaintiff's Claims are Untimely*

Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

All of Plaintiff's claims are time-barred. Plaintiff concedes that she did not file the Charge with the EEOC until August 24, 2007, making any claims based on decisions or conduct affecting Plaintiff that occurred prior to October 28, 2006 untimely. (Pl.Dep.55, Ex. 2.); *See Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 624, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007) (claims alleging discriminatory or harassing conduct must be filed within 300 days of the purportedly unlawful conduct); *Johnson v. Nat'l Maritime Union Pension & Welfare Plans,* No 95 Cov. 4112(LMM), 1998 U.S. Dist. LEXIS 735, at *17, 1998 WL 32759 (S.D.N.Y. Jan. 29, 1998).[FN2] Because Plaintiff voluntarily resigned her employment prior to such date—on September 22, 2006—Plaintiff's claims are time-barred. (*Id.* at 44.)

> FN2. The newly enacted Fair Pay Act, which amends 42 U.S.C. § 2000(e)–5(e)(3), supercedes *Ledbetter* only as it relates to the timeliness of discriminatory compensation claims, which Plaintiff has not asserted here. *See e.g., Mikula v. Allegheny County of Pennsylvania,* No. 07–4023, 2009 U.S.App. LEXIS 6281, at * 5 (3d Cir. Mar. 10, 2009); *Leach v. Baylor College of Med.,* 2009 U.S. Dist. LEXIS 11845, at * 50, 2009 WL 385450 (S.D.Tex., Feb. 17, 2009).

In addition, Plaintiff's claims also fail because she failed to commence suit within 90 days of receiving a right-to-sue letter from the EEOC. Plaintiff's right-to-sue letter is dated September 11, 2007, and it is presumed to have been mailed on that date. (Pl.Dep.56, Ex. 3); *see Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). It is further presumed that Plaintiff received the right-to-sue letter within 3 days (*i.e.,* by Friday, September 14, 2007.) *See Baldwin,* 466 U.S. at 148 n. 1. The Complaint, however, was not filed until December 14, 2007–one day after the 90–day limit within which Plaintiff was required to commence suit.

**B.** *Plaintiff's Claims Are Without Merit*

**\*3** At her deposition, Plaintiff identified two incidents she experienced during her employment that she alleges demonstrate age and/or racial bias on the part of Defendant. Specifically, Plaintiff alleged that: (i) she was subjected to a comment by a non-decision-making colleague that she believed was age-related; and (ii) she was treated less favorably than a purportedly similarly situated African–American colleague in that she was required to use a half day of PTO for failing to return to work after attending an industry luncheon.[FN3] (Pl.Dep.28–37.) As discussed below, Plaintiff cannot establish a *prima facie* case of discrimination with respect to either incident.

> FN3. Plaintiff also testified about several additional incidents that form the basis of her lawsuit. Specifically, Plaintiff testified that: (i) her bereavement days were erroneously classified as PTO; (ii) she received a written warning in response to her taking unplanned vacation days; and (ii) job responsibilities were removed from her after she made a mistake. (Pl.Dep.25–27, 39–47.) Notably, Plaintiff does not deny that the mistake relating to her bereavement days was ultimately corrected by Defendant, and, thus, such error is irrelevant here. (*Id.* at 40–41.) Similarly, Plaintiff does not deny taking unplanned vacation days or making the mistake that led to the removal of her job responsibilities. (*Id.* at 25–27, 41–46.) Further, Plaintiff does not contend that the removal of her job responsibilities constituted a demotion and she concedes that her salary was not negatively impacted by the removal. (*Id.* at 27–28.) Most significantly, Plaintiff does not allege that any of these "incidents" was in any way related to her age or race. (*Id.* at 25–27, 39–47.) Accordingly, they are irrelevant.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

i. *The Age–Related Comment*

Concerning the age-related comment, Plaintiff complains that while attending a team party in celebration of her 47th birthday, she was asked her age by a non-decision-making colleague, Alicia Rockwell ("Ms.Rockwell").[FN4] (Pl.Dep.28–31.) Significantly, Plaintiff testified that she did not have a problem saying her age and, more importantly, that no actions were taken against her thereafter based on her age. (Pl.Dep.30–31.) Because Plaintiff cannot identify any adverse treatment that she allegedly experienced related to her age generally—or to this incident specifically—Plaintiff cannot establish a *prima facie* case of age discrimination. *See Faul v. Potter,* No. 06 Civ. 1169, 2008 U.S. Dist. LEXIS 89841, at *8–10, 2008 WL 4835001 (N.D.N.Y. Nov. 5, 2008) (dismissing plaintiff's retaliation claim for failure to establish an adverse action).

> FN4. Although Plaintiff contends that Ms. Rockwell is a supervisor, she admits that Ms. Rockwell had no supervisory authority over her. (Pl.Dep.29.) Moreover, like Plaintiff, Ms. Rockwell reported to Ms. Goodwine–Pittman. (*Id.*)

In sum, this incident—which is nothing more than an innocuous inquiry by a colleague at a celebration for Plaintiff's birthday—does not constitute an adverse action. Thus, Plaintiff's age discrimination claim fails as a matter of law.

ii. *The Required Use of PTO*

The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions of an individual's employment. *See Galabya v. New York City Bd. Of Educ. .,* 202 F.3d 636, 640 (2d Cir.2000). To be materially adverse, Plaintiff's working conditions must undergo a change "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). Employment actions—such as that alleged here—that do not materially adversely affect the terms and conditions of a plaintiff's employment simply are not actionable under the relevant anti-discrimination laws.

Here, although Plaintiff was required to use a half day of PTO for failing to return to work after leaving the NAIW luncheon, she still received her full day's salary for the day in question.[FN5] (Kurtzman Aff. ¶ 5.) Further, at the time of her resignation, Plaintiff had exceeded her yearly accrued PTO by more than 40 hours. (*Id.* at ¶ 6.) Defendant, however, did not elect to seek recoupment of this amount upon Plaintiff's resignation. (*Id.*) Thus, in reality, Plaintiff did not lose any PTO due to her failure to return to work after the luncheon. Therefore, Plaintiff cannot establish that the deduction of her PTO had any impact—much less a materially adverse impact—on the terms and conditions of her employment. *See Faul,* 2008 U.S. Dist. LEXIS 89841, at *10, 2008 WL 4835001 (finding proposed suspension does not constitute an adverse employment action); *Baptiste v. Cushman & Wakefield,* No. 03 Civ. 2102(RCC), 2007 U.S. Dist. LEXIS 19784, at * 25, 2007 WL 747796 (S.D.N.Y. Mar. 7, 2007) (finding denial of vacation leave does not rise to the level of adverse employment action.) Accordingly, because Plaintiff did not suffer an adverse action, her race discrimination claim also fails as a matter of law.

> FN5. This was appropriate use of PTO, which is intended to be used for an employee's time away from work. (Kurtzman Aff. ¶ 5.)

**\*4** In any event, even if such required use of PTO were deemed an adverse employment action, Plaintiff has not established disparate treatment. Specifically, Plaintiff alleges that she was required to use a half day of PTO for failing to return to work after the NAIW luncheon whereas Mrs. Bramwell, who also attended the luncheon, was not required to use such time. (Pl.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

Dep. 33–34; Kurtzman Aff. ¶ 5 .) Plaintiff speculates (incorrectly) that Ms. Bramwell did not return to work after the luncheon.[FN6] Plaintiff and Ms. Bramwell are not similarly situated in this instance because, unlike Plaintiff, Ms. Bramwell did return to work following the NAIW luncheon. (Kurtzman Aff. ¶ 5.) Thus, Plaintiff cannot use their alleged disparate treatment to establish an inference of race discrimination. *See, e.g., Anderson v. Anheuser–Busch, Inc.,* No. 00 Civ. 7089, 2000 U.S.App. LEXIS 23763, at *3–4, 2000 WL 1370266 (2d Cir. Sept. 19, 2000) (affirming summary judgment on ground that employees were not similarly situated to plaintiff because they did not engage in same misconduct).

> [FN6]. Plaintiff herself admits that she does not know whether Ms. Bramwell returned to work after the luncheon. (Pl.Dep.39, 60–61.)

Plaintiff has also failed to proffer any cognizable evidence of pretext with respect to this claim.

iii. *Plaintiff Has Proffered Neither Allegations Nor Evidence of a Hostile Environment*

To establish a claim of hostile work environment, Plaintiff must demonstrate that: (i) she is a member of a protected group; (ii) she was the subject of unwelcome harassment; (iii) the harassment was based upon her age or race; and (iv) the harassment was severe and pervasive in that it affected a term, condition or privilege of employment. *See Cosgrove v. Sears Roebuck & Co.,* 9 F.3d 1033, 1042 (2d Cir.1993), *aff'd without opinion,* 104 F.3d 355 (2d Cir.1996). Plaintiff must show "more than just isolated incidents or casual comments that express harassment or hostility." *Babcock v. Frank,* 783 F.Supp. 800, 808 (S.D.N.Y.1992). Additionally, Plaintiff must show that the harasser's actions should be imputed to the employer. *See Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003), *cert. denied* 540 U.S. 1016, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003). As demonstrated below, Plaintiff cannot show these necessary elements, and, thus, her hostile work environment claims fail as a matter of law.

To begin, Plaintiff cannot establish a claim for hostile work environment because she does not even allege any harassing conduct. Rather, Plaintiff simply contends that she worked in an "uncomfortable" and "negative" environment and that "it just was not a good place to work." (Pl. Dep. 30; 47–49). Specifically, Plaintiff's testimony concerning the existence of a hostile work environment is as follows:

Q: I think you also claimed that there was a hostile environment. What do you mean by there was a hostile environment?

A: From the time of, I would say after Cheryl had assumed the management responsibilities or the overall responsibility for the team and began moving the teams around, people had begun to leave and what had happened is the complete overall make-up of the group was changing and as people were leaving and I assume different things had gone over, whomever, it became a very negative place to work. So that made it difficult. There were no efforts made to try to get past it or to communicate, or to make things any better. Everybody pretty much just minded their own business and had had done their work. There was no effort to, you know, just work assignment, take an interest going again—

*5 Q: This was for the entire department?

A: The entire, our team. There was really no interest in any type of any additional training or anything like that so people were becoming very disgruntled and very upset.

(Pl.Dep.47–48.) It is amply clear from Plaintiff's own testimony that she is unable to articulate any harassing behavior whatsoever, much less any that bears a connection to her age or race. *See Ponniah Das v. Our Lady of Mercy Med. Ctr.,* No. 00 Civ.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)
**(Cite as: 2009 WL 2432374 (S.D.N.Y.))**

2574(JSM), 2002 U.S. Dist. LEXIS 7771, at *22, 2002 WL 826877 (S.D.N.Y. Apr. 29, 2002), *aff'd,* 2003 U.S.App. LEXIS 1213 (2d Cir. Jan. 23, 2003) (finding that comments unrelated to protected category fail to support discrimination claim).

Plaintiff further undermines her allegations of "harassment" by admitting that Ms. Goodwine–Pitman treated the entire team, which was comprised of employees of mixed ages and races, in the same distant manner. (Pl.Dep.19–23, 44–45, 49.) Plaintiff's chief complaint against Ms. Goodwine–Pitman is that she was "cold" and "gruff at times" and Plaintiff at no point alleges such treatment was based upon Plaintiff's age or race. (Pl.Dep.20.) It is well-settled that the anti-discrimination laws are not intended to serve as a general civility code and that personal animosity is simply not prohibited by these laws. *See Pergament v. Federal Express Corp.,* 03 Civ. 1106(ENV)(AKT), 2007 U.S. Dist. LEXIS 23732, at * 52, 2007 WL 1016993 (E.D.N.Y. Mar. 30, 2007); *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 309–310, 786 N.Y.S.2d 382, 394, 819 N.E.2d 998 (N.Y.2004) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Accordingly, because the alleged "harassment" bears absolutely no connection to Plaintiff's age or race, her hostile work environment claims fail as a matter of law.

III. *CONCLUSION*

For the foregoing reasons, Defendant's motion for summary judgment [dkt. no. 13] is GRANTED. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2009.
Luongo v. St. Paul Travelers
Not Reported in F.Supp.2d, 2009 WL 2432374 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.